UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THRASIO, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| CHARLES CHANARATSOPON, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Thrasio, LLC ("Thrasio"), through its attorneys, alleges the following against Charles Chanaratsopon ("Chanaratsopon"):

## <u>NATURE OF ACTION</u>

1.      This lawsuit arises out of Chanaratsopon's blatant unauthorized use of Thrasio's highly valuable business information to build a competing business, Boosted Commerce, Inc. ("Boosted").

2.       Thrasio buys and grows Amazon businesses ("Third-Party Sellers").  Specifically, Thrasio acquires either the Third-Party Sellers themselves or their assets (e.g., their brand IP and inventory of consumer goods for sale).  Thrasio then markets and sells those consumer goods, primarily on Amazon.com.  Thrasio has acquired dozens of Third-Party Sellers in just over two years, and now offers more than 10,000 products for sale on Amazon.  Thrasio's success derives from two proprietary business processes that Thrasio has spent significant time and resources developing.

3.      The first is a standardized due diligence process (the "Standard Diligence Process") that Thrasio uses to determine whether to acquire a Third-Party Seller.  This process is based on the use of template forms, checklists, and document requests, as well as a proprietary "keyword" analysis of how the target's products rank against other products in Amazon search results, all of

which Thrasio has developed so that it is able to vet Third-Party Sellers efficiently and expeditiously.  Thrasio's use of the Standard Diligence Process has enabled it to complete each acquisition, on average, within 43 days of expressing interest in a Third-Party Seller.  Further refinements to the Standard Diligence Process now enable Thrasio to complete acquisitions in less than 35 days on average.

4.      The second key proprietary business process is Thrasio's standardized process for the efficient integration and on-boarding of newly acquired Third-Party Sellers into its operational network (the "Standard Integration Process").  The Standard Integration Process allows each new business to be upgraded to adopt Thrasio's gold standard processes, including for supply chain, marketing, search keyword optimization, and trademark protection.  The goal of the Standard Integration Process is to rapidly increase sales while streamlining the business, and Thrasio has been so successful in deploying this process with each new acquisition that it has been able to pay 94 percent of its earn-outs (that is, post-acquisition payments to the Third Party Sellers contingent on Thrasio being able to achieve benchmark sales within a set period of time).

5.      The Standard Diligence Process and Standard Integration Process have independent value to Thrasio by virtue of their confidential and proprietary nature.  These processes are described and memorialized in documents and other materials that Thrasio carefully guards.

6.      Thrasio's success has attracted competition.  Now, to maintain its place in the market, Thrasio must race against other sophisticated competitors to acquire promising Third-Party Sellers.  This increased competition makes Thrasio's Standard Diligence Process and Standard Integration Process even more critical tools for success, and makes their secrecy all the more important for Thrasio to maintain.

7.      Chanaratsopon is the co-founder and CFO of Boosted, which is one such competitor.  But instead of developing its own methods for conducting efficient due diligence and brand enhancement like Thrasio did, Chanaratsopon and Boosted have unfairly built a business on the back of Thrasio's work, replicating Thrasio's proprietary business processes by its

unauthorized use of a trove of documents detailing these business processes, to which Boosted improperly obtained access through Chanaratsopon.

8.      Specifically, Chanaratsopon used his position as an indirect investor in Thrasio to gain access to a dataroom containing Thrasio's proprietary and confidential information, which was hosted by Upper90, a venture capital firm (the "Dataroom").

9.      Thrasio entrusted its trade secrets to Upper90 under conditions of strict confidentiality, for the sole purpose enabling Upper90 and its investors to decide whether to invest in Thrasio.

10.     Chanaratsopon himself signed a non-disclosure agreement ("NDA") with Upper90 before first accessing the Dataroom in March 2019.  He thereafter accessed the Dataroom on thirteen separate occasions between December 2019 and July 2020 – during the time when Chanaratsopon was founding and establishing Boosted, which was incorporated in or about December 2019 – each time acknowledging his ongoing confidentiality obligations and use restrictions.

11.     Chanaratsopon did not just casually review the contents of this Dataroom.  He studied the Standard Diligence Process and the Standard Integration Process in detail with a plan to form a competing business.  He bulk-downloaded the material repeatedly in 2019, then devised and founded Boosted, launched its website, and hired its first employees.  Chanaratsopon then bulk-downloaded and reviewed Thrasio's materials again in 2020.  All told, Chanaratsopon logged in to the Dataroom a total of forty-five times, on twenty-four separate days, both before and after making his investment decisions relating to Thrasio, between March 2019 and July 2020.

12.     Using this improperly obtained information to kick start its operations, Boosted quickly grew, began acquiring Third Party Sellers, and attracted investors, conducting its Series A funding round in September 2020—far sooner than Boosted would have been able to do without using the misappropriated Thrasio information.  For a competitor like Boosted to have access to and knowledge of these documents (through Chanaratsopon) presents an existential threat to Thrasio, because it has enabled Boosted to directly compete against Thrasio using Thrasio's own

confidential processes, without having had to expend the substantial time and effort that Thrasio spent to develop such processes.

13.     Boosted's marketing materials confirm that it is misappropriating Thrasio's confidential playbooks to directly compete in this space.  For example, Boosted advertises on its website that it can buy Third-Party Sellers "within 45 days!"–essentially identical to Thrasio's own historical track record of 43 days.  Boosted's website goes on to boast about a systematized DUE diligence process model including a review of financials, supply chain, marketing and inventory–again, essentially identical to Thrasio's own process.

14.     By deploying this secret information for the improper purpose of competing with Thrasio, Chanaratsopon has violated the law.

15.     Thrasio brings this lawsuit to recover damages for Chanaratsopon's misappropriation of Thrasio's trade secrets and confidential information, and to seek related equitable relief.[1]

## PARTIES, JURISDICTION, AND VENUE

16.     Plaintiff Thrasio is a limited liability company organized in Delaware.

17.     Defendant Charles Chanaratsopon ("Chanaratsopon") is an individual residing in Houston, Texas.  On information and belief, Chanaratsopon maintains his primary residence in Houston.

18.     Chanaratsopon is the co-founder of Boosted Commerce ("Boosted"), a Delaware corporation with a principal place of business in Los Angeles, California.  As described more fully herein, Chanaratsopon misappropriated Thrasio's valuable trade secrets and other confidential information in order to found Boosted, a direct competitor to Thrasio.

19.     This Court has subject matter jurisdiction over Thrasio's federal trade secret claim pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.

---

[1] Thrasio is simultaneously suing Boosted in the United States District Court for the Central District of California, raising similar claims arising out of the same events described herein.

20.     This Court has supplemental jurisdiction over Thrasio's state and common-law claims pursuant to 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over Chanaratsopon because, on information and belief, he maintains his primary residence in Houston, Texas.  Accordingly, this Court has general jurisdiction over Chanaratsopon.

22.     Venue lies in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. §§ 1391(b)(1), as Chanaratsopon resides in Houston, Texas.

## FACTUAL BACKGROUND

### I.     THRASIO'S PROPRIETARY BUSINESS PROCESSES

23.     Thrasio, founded in 2018, has pioneered the business of acquiring Third-Party Sellers and/or their associated brands.  The founders of Third-Party Seller businesses often find it difficult to meet the operational demands of the business as sales grow, and are eager to sell to a larger operator like Thrasio.  Following acquisition, Thrasio folds the Third Party Seller's business into Thrasio's professional logistical network, and applies well-honed marketing and management techniques to further grow its acquired brands.  Since inception, Thrasio has bought dozens of Third-Party Sellers.

24.     The success of Thrasio's business depends on its ability to (1) acquire as many quality businesses as possible and (2) improve each business's sales.

25.     The market that Thrasio has pioneered is rapidly becoming more competitive. According to *Forbes* magazine, between ten and fifteen companies with similar missions have each raised more than $100 million apiece from investors within the last twenty-four months.  Each of these companies now is competing with Thrasio to acquire Third-Party Sellers.

26.     A Third-Party Seller who seeks to sell can now expect to be contacted by many of these competitors, and to receive many attractive offers.  To succeed in the ensuing bidding war for a Third-Party Seller, a prospective buyer must be able to efficiently but thoroughly investigate the business, make a competitive offer, and quickly complete the acquisition.

27.     The speed of Thrasio's due diligence process gives it a competitive edge.  For instance (as reported in *Forbes* magazine), when the founder of Angry Orange Odor Eliminator (a cleanser designed to eliminate pet odor) wanted to sell his business, he was "inundated with phone calls" from potential buyers.  Thrasio won the bidding war when it "sent a term sheet within a week of the listing and insisted on a response the next day."

28.     Thrasio is able to perform the necessary diligence quickly and efficiently by applying its proprietary Standard Diligence Process each time it considers the acquisition of a new Third-Party Seller.  The Standard Diligence Process entails use of easily-adaptable templates such as a seller information form and diligence request letter.  These templates ask for key information about the Third-Party Seller's business.  Third-Party Sellers all share various similarities in their core business (supply chain management, brand management, interactions with Amazon, customer service and reviews, and search-engine optimization), and these templates ask for specific information about these and other aspects of their business.  By using template documents, Thrasio is able to make its initial outreach to a new potential acquisition target more quickly, and to ensure that it quickly and efficiently gathers all the information it needs.

29.     In addition, Thrasio has developed detailed internal checklists and processes for researching key aspects of Third-Party Seller businesses, such as the products themselves, supply chain, marketing, the seller's Amazon account, customer service, finances, legal, and search keyword optimization.  Search keyword optimization is a particularly key aspect of the diligence process, given that customers find goods on Amazon primarily by searching for them using Amazon's text search tool, and given that each Third-Party Seller is often competing with many others to sell the same kind of product.  Thrasio uses search keyword data gathered from many different research tools, and aggregates it into a single spreadsheet where it can be analyzed using custom metrics that Thrasio has developed, which no off-the-shelf keyword analysis tool can replicate.  The Standard Diligence Process includes step-by-step instructions for conducting search keyword research, as well as the template spreadsheet used to aggregate the resulting data – as

well as similarly detailed processes for investigating other aspects of the Third-Party Seller's business.

30.    Once it acquires a quality business, Thrasio achieves its second objective of onboarding and growing the new business by using the Standard Integration Process. For Thrasio, as co-founder Josh Silberstein explained it recently to *Forbes* magazine, "every new business acquired by Thrasio is put on the so-called conveyor belt, where a core team of a half-dozen employees works through a 503-point checklist of best practices in an average of 34 days, farming out tasks to a deep bench of specialists in supply chain, legal and other departments as needed."

31.    Thrasio's Standard Integration Process entails the deployment of well-honed standard operating procedures ("SOPs") to improve various key aspects of the newly-acquired products, including harmonizing stock-keeping unit ("SKU") codes to permit easy tracking of inventory, evaluating trademark usage, assessing the right level of inventory to maintain, managing cross-border shipping and logistics, improving the product's marketing and branding, quickly responding to counterfeiters and brand hijackers, and responding to Amazon inquiries concerning hazardous materials, among other things.

32.    Each of these SOPs comprises a set of repeatable, efficient steps to be performed by Thrasio's employees and non-employee service providers. This standardized process has enabled Thrasio to quickly fold dozens of newly-acquired brands into its platform over the last two years. Thrasio has developed these SOPs with considerable effort, and they represent Thrasio's best practices for addressing some of the most challenging problems that face Third-Party Sellers. For instance, in a marketplace like Amazon, malicious actors stealing a successful brand and confusing customers is a constant threat which successful sellers must constantly guard against. Thrasio's anti-hijacking SOP would provide a competitor with a plug-and-play solution for addressing this challenge in the marketplace.

33.    The Standard Diligence Process and Standard Integration Process documentation constitute the most important class of confidential and proprietary information in Thrasio's possession. These materials represent the operating manual for the business and are protected as

a core asset. They provide a detailed roadmap that would enable a competitor to replicate Thrasio's successful method for quickly investigating and acquiring Third Party Sellers, without having to make the same investment of employee time and effort, and trial and error, that Thrasio itself had to conduct.  Thrasio derives independent value from these trade secrets by keeping them secret from competitors.

## II.  THRASIO PROTECTS THE SECRECY OF ITS PROPRIETARY INFORMATION

34.     Thrasio takes extensive measures to maintain the secrecy of the Standard Diligence Process and Standard Integration Process, and to protect and limit any necessary disclosure of the information, as well as the documents which disclose these processes.

35.     Thrasio's policy is for all employees and non-employee service providers to sign agreements including robust confidentiality commitments before commencing services.  Thrasio employees are also bound by an Employment Manual, which specifically prohibits them from sending confidential business information via e-mail or over the internet unless specifically authorized, or from dispersing company data to any external party without authorization.

36.     Thrasio's standard employee confidential information and invention assignment agreement defines confidential information as including Thrasio's know-how and trade secrets, among other things.  Under this agreement, the employee agrees to treat all such information as confidential and not to disclose it to any person who does not have a need to know it in order to further the business of Thrasio.  The obligations under this agreement extend past termination of the employment relationship.

37.     Thrasio ensures that its non-employee service providers make similar confidentiality commitments before beginning their work.

38.     In addition, Thrasio maintains its confidential data on secure computer systems. Until in or around 2019, Thrasio maintained the documents constituting the Standard Diligence Processes and Standard Integration Processes on secure, password-protected repositories hosted by Dropbox and G-Suite.   Dropbox and G-Suite adhere to the most stringent enterprise security compliance standards, and data is encrypted both while in-transit and at-rest.  Thrasio only gave

employees and non-employee service providers access to Dropbox and G-Suite on a need-to-know basis.

39.     Beginning in or around summer 2019, Thrasio migrated the Standard Diligence Process and Standard Integration Processes into a dedicated knowledge management tool.  That tool, like the prior repositories, is password-protected and offers state-of-the-art enterprise security features.  Thrasio only extends access to employees and non-employee service providers on a need-to-know basis.

40.     As Thrasio has grown and hired more employees, the sophistication of its information technology security has also grown, keeping pace with Thrasio's increasing size and administrative demands, and further demonstrating Thrasio's commitment to protecting the secrecy of its trade secrets, including the Standard Diligence Process and Standard Integration Process.  Thrasio now uses a sophisticated enterprise password-management and single sign-on service, conducts information security trainings for employees, employs sophisticated mechanisms to detect and combat phishing attacks, and is deploying endpoint protection technology to employee laptop devices.

41.     Because Thrasio's Standard Diligence Process and Standard Integration Process are so central to its business success and its key competitive advantages, Thrasio does not share these processes (or the documents reflecting these processes) with anyone outside the company unless absolutely necessary.  In such circumstances, Thrasio protects its trade secrets by ensuring that the recipient commits to keep the Standard Diligence Process and Standard Integration Process confidential.

## III.    THRASIO PROVIDED TRADE SECRET MATERIAL TO UPPER90 UNDER CONDITIONS OF STRICT CONFIDENTIALITY

42.     Beginning in 2018, Thrasio decided to share documents embodying its Standard Diligence Process and Standard Integration Processes with Upper90, a venture capital firm which was Thrasio's first source of outside funding, and which has provided critical funding to Thrasio at every step of its growth.

43.     Before deciding whether to invest in Thrasio, Upper90 required a level of detail and precision about Thrasio's business and prospects that could not be determined from public sources, and specifically requested access to documents giving it a detailed look into Thrasio's due diligence and integration processes.  By sharing some of the documents reflecting its Standard Diligence Process and Standard Integration Process with Upper90 in confidence, Thrasio was able to demonstrate its unique business strategies and operational strengths to Upper90 (and Upper90's own investors).

44.     The documents to which Thrasio gave Upper90 access included historical and projected financial information, a capitalization table, key contracts, employment agreements, and management's analysis, as well as documents describing and constituting Thrasio's Standard Diligence Process and Standard Integration Process.

45.     The Standard Diligence Process documents that Thrasio disclosed to Upper90 under these terms, and for this purpose, included the following:

    a.    Two iterations of a 12-page memorandum describing, step-by-step, the different components of Thrasio's brand diligence process, including guidelines for receiving and storing information received from Third-Party Sellers, key "Day-1" diligence requests, and explanations and processes for conducting diligence into eight subject areas relevant to the health and prospects of a Third-Party Seller;

    b.    A sample diligence request letter to a Third Party Seller;

    c.    A 6-page "Seller Information Form," including both tables and narrative questions concerning the Third-Party Seller's business;

    d.    A "Day 1" diligence checklist, listing critical tasks to be done on the first day of diligence, with explanations;

    e.    A 9-page memorandum describing, step-by-step, Thrasio's process for reviewing the strength and potential of a product sold on Amazon.com, based on detailed analysis of search keywords;

      f.      An example spreadsheet aggregating keyword research data from several sources, displayed in a format enabling a holistic assessment of the strength and potential of certain products sold by a Third Party Seller;

      g.      A 43-page memorandum constituting the final acquisition diligence memo prepared by Thrasio in connection with its diligence into a Third-Party Seller, including numerous tables, screenshots, narrative analysis, deal terms, appendices, and recommendations;

      h.      A sample dataroom containing more than a thousand documents collected by Thrasio in connection with one of its acquisitions, organized by subject matter.

46.     Thrasio also gave Upper 90 access to documents reflecting and constituting its Standard Integration Process, including (among others):

      a.      A two-page memorandum drafted for investors, describing Thrasio's standard operating processes, detailing strategies for managing and refining these processes, and describing other Standard Integration Process documents;

      b.      A three-page memorandum constituting Thrasio's Standard Operating Procedure ("SOP") for SKU nomenclature;

      c.      An eleven-page memorandum constituting Thrasio's SOP for evaluating trademarks;

      d.      A four-page memorandum constituting Thrasio's SOP for product inventory planning;

      e.      A five-page memorandum constituting Thrasio's SOP for cross-border inventory ordering and logistics;

      f.      Case studies on Thrasio's successful enhancements of brands it acquired from Third-Party Sellers;

g.   Examples of periodic reports used by Thrasio to assess product sales, success of marketing campaigns, and keyword research;

h.   A four-page memorandum constituting Thrasio's SOP for combatting hijackers, i.e., bad actors selling counterfeit goods;

i.   A five-page memorandum constituting Thrasio's SOP for responding to Amazon requests for information concerning hazardous materials in products.

47.   Thrasio took measures to ensure that these materials, including the Standard Diligence Process and Standard Integration Process information, would remain confidential.  For example, Thrasio entered into a credit agreement with Upper90, which contained a confidentiality clause whereby Upper90 committed to keep Thrasio's information confidential, and only to share it with investors and prospective investors who, themselves, committed to keep the material confidential and not to use it for any purpose other than to investigate the opportunity to invest in Thrasio.

48.   Thrasio and Upper90 have amended the Credit Agreement several times since November 2018.  At the time of each amendment, Thrasio and Upper90 re-confirmed that the terms of the underlying Credit Agreement (including the confidentiality obligation on Upper90) remain in effect unless specifically amended.

49.   To adhere to its confidentiality obligations, Upper90 maintained the Standard Diligence Process and Standard Integration Process documents on a DealVDR data room (the "Dataroom"). The Dataroom used 256-bit AES encryption and hosted data in ISO/IEC 27001:2013 certified data centers, which undergo SSAE16 & SOC2 Type II audits annually.  DealVDR has a number of security features, including user-specific audit trails, with robust access and permissions controls for hosts like Upper90.

50.   Beginning in late 2019, Upper90 set up the Dataroom to display the following message to users before they could access the Dataroom:

**The information contained in this data room is strictly confidential and is provided to you solely for your reference to allow you to make your own evaluation of the company.** Any unauthorized access, duplication, reproduction, dissemination or onward transmission of the material in this data room is strictly prohibited. You agree to keep the information in this data room confidential and treat the information contained herein as material, non-public information where applicable. You agree not to share your login credentials with any other person or entity without express authorization to do so. By accessing the data room, you agree to only process the personal data contained in the documents to the extent necessary and in accordance with our Privacy Policy and Terms of Use. The information contained in this data room may include forward-looking statements with respect to future events or financial performance. These views may be based on a number of assumptions and are subject to various risks. Such forward-looking statements are not guarantees of future performance and no assurance can be made that any future events will occur, that projections will be achieved, or that the company's assumptions or any other assumptions contained herein will prove to be correct. Actual results may differ materially from those projected, and the Company does not undertake to revise any such forward-looking statements to reflect future events or circumstances. By clicking "I Agree" below, you agree with the terms of this disclaimer.

(emphasis added).

51.     Investors who access the Dataroom must click "I Agree" to indicate their acceptance of these terms before they can review Thrasio's confidential materials.

52.     In addition, many of the documents on the Dataroom are stamped with headers labelling the document as "CONFIDENTIAL INFORMATION – DO NOT DISTRIBUTE."

## IV.     CHANARATSOPON OBTAINED ACCESS TO THRASIO'S TRADE SECRETS FROM UPPER90

53.     Charles Chanaratsopon is an investor in Upper90 who obtained access to Thrasio's trade secrets through the Dataroom.  Chanaratsopon had no personal experience in the market of acquiring Third-Party Sellers, and little information about the dynamics of that market or the opportunities and challenges of entering that market, before he reviewed Thrasio's Dataroom materials.

54.     Chanaratsopon's prior entrepreneurial experience was in traditional retail stores. Specifically, Chanaratsopon founded "Charming Charlie," a retail fashion jewelry chain, which

filed for Chapter 11 bankruptcy in 2017; Charming Charlie emerged from bankruptcy in 2018, but then filed for Chapter 11 bankruptcy again in summer 2019.

55.   In December 2018, Chanaratsopon executed a mutual non-disclosure agreement with Upper90.  In this NDA, Chanaratsopon acknowledged that he would be receiving confidential information from Upper90 to enable him to evaluate investment opportunities, and that such information would include information that Upper90 itself had received on conditions of confidentiality from third parties.   As the "Recipient" of such information, Chanaratsopon committed to keep it confidential, and not to use it for any purpose other than to evaluate investment opportunities presented by Upper90, as "Discloser":

> 2.   <u>Nondisclosure and Nonuse Obligations</u>.  **Recipient will not use any Confidential Information except to the extent necessary in connection with the Discloser's evaluation of one or more potential investments and/or transactions (the "Purpose")** and Recipient will not   disseminate or in any way disclose any Confidential Information to any third party, except as such disclosure is expressly permitted in this Agreement. . . .  Recipient shall treat all of Discloser's Confidential Information with the same degree of care as Recipient accords to Recipient's own Confidential Information, but not less than reasonable care.  Recipient shall disclose Discloser's Confidential Information only to Recipient's directors, officers, employees (if any), and agents (including attorneys, accountants, consultants, financial advisors and similar advisers) and existing or prospective financing sources (collectively, "Representatives") who need to know the information to assist Recipient with respect to the Purpose. Recipient certifies that each of its Representatives will have agreed to be bound by obligations of confidentiality substantially similar to those terms and conditions applicable to Recipient under this Agreement.  Recipient acknowledges and agrees that it will be liable and responsible for any unauthorized disclosure or use of such information by its Representatives.

56.   Pursuant to this NDA, Upper90 granted Chanaratsopon access to the Dataroom, to enable Chanaratsopon to evaluate the opportunity to invest in Thrasio.

57.   Chanaratsopon began accessing Thrasio documents through the Dataroom in March 2019.  Chanaratsopon proceeded to make three separate indirect investments in Thrasio

-14-

through Upper90 special-purpose vehicles: (a) a debt transaction in or around March 2019, (b) a second debt transaction in or around September 2019, and (c) an equity transaction in or around June 2020.  Chanaratsopon logged into the Dataroom a total of forty-five separate times, on twenty-four different days, between March 2019 and July 2020.  During this same period, in or about December 2019, Chanaratsopon incorporated Boosted.

58.    In connection with each of Chanaratsopon's three investments, Chanaratsopon agreed to keep documents relating to the investment received from Upper90 confidential.

59.    The LLC operating agreements for the Upper90 special-purpose vehicles in which Chanaratsopon invested in March and September 2019 each included the following confidentiality commitment:

> 2.10 (a) Each Member agrees not to make any use of (other than for purposes reasonably related to his, her, or its Interest in the Company or for purposes of filing such Member's tax returns or for other routine matters required by law) or to disclose to any Person (other than such Member's employees, agents, accountants, advisors (including financial advisors), or representatives responsible for matters relating to the Company who agree to be bound by the confidentiality provisions described in this Agreement), and to keep confidential **any information or matter relating to the Company and its affairs**, including, without limitation, the identities of the other Members, **all offering materials used in connection with the marketing and private placement of Interests in the Company** (including, without limitation, this Agreement, the Subscription Agreement, and any related marketing and other disclosure documents), **and any information or matter related to any Company Investment or the business and operations of the Company, including, without limitation, financial information, valuations, information regarding potential investments, trade secrets, and other confidential and/or proprietary information**.

(emphasis added).

60.    The LLC operating agreement for the Upper90 special-purpose vehicle in which Chanaratsopon invested in June 2020 contained a similar confidentiality commitment:

> **9.6 Confidentiality**. **All information concerning the business, affairs and properties of the Fund and all of the terms and provisions of this Agreement will be held in confidence by each**

**Manager and Member and their respective Affiliates**, subject to any obligation to comply with (a) any applicable law, (b) any rule or regulation of any legal authority or securities exchange, (c) any subpoena or other legal process to make information available to the Persons entitled thereto or (d) the enforcement of that Party's rights under this Agreement (or under any employment agreement with that Member, if any) in any legal process, arbitration, as a Member, Organizer, Manager, Administrative Manager or employee, as applicable. Confidentiality will be maintained until that time, if any, as the confidential information either is, or becomes, published or a matter of public knowledge (other than as a result of a breach of this Section 9.6); *provided* that each Party recognizes that the privilege each has to maintain, in its sole discretion, the confidentiality of a communication relating to the transactions, including a confidential communication with its attorney or a confidential communication with a federally authorized tax practitioner under Section 7525 of the Code, is not intended to be affected by the foregoing provisions of this sentence. Notwithstanding this Section 9.6, the Manager, Administrative Manager may use confidential information about the Fund and its Members in data aggregation, so long as the data use does not include the disclosure of information that could reasonably be used to identify any Member

(emphasis added).

61.     In addition, as mentioned above, beginning in late 2019, the Dataroom displayed a message to users indicating (among other things) that "[t]he information contained in this data room is strictly confidential and is provided to you solely for your reference to allow you to make your own evaluation of the company."  Chanaratsopon clicked to acknowledge his acceptance of these terms on thirteen separate occasions.   Most of these acknowledgements post-dated Chanaratsopon's formation of Boosted in December 2019:

| # | User | Timestamp (ET) | IP Address | Event |
|---|------|----------------|------------|-------|
| 145070 | cchanaratsopon07@gmail.com | Dec 14, 2019 12:40 PM | 76.75.10.187 | Data room disclaimer accepted |
| 144881 | cchanaratsopon07@gmail.com | Dec 22, 2019 9:07 PM | 76.91.252.167 | Data room disclaimer accepted |
| 140245 | cchanaratsopon07@gmail.com | Feb 18, 2020 5:39 PM | 76.91.252.167 | Data room disclaimer accepted |
| 140188 | cchanaratsopon07@gmail.com | Feb 19, 2020 1:23 PM | 205.209.24.227 | Data room disclaimer accepted |

| # | User | Timestamp (ET) | IP Address | Event |
|---|------|----------------|------------|-------|
| 136503 | cchanaratsopon07@gmail.com | Mar 8, 2020 12:43 AM | 76.91.252.167 | Data room disclaimer accepted |
| 62239 | cchanaratsopon07@gmail.com | May 18, 2020 5:05 PM | 76.91.252.167 | Data room disclaimer accepted |
| 60414 | cchanaratsopon07@gmail.com | May 19, 2020 5:50 PM | 76.91.252.167 | Data room disclaimer accepted |
| 58714 | cchanaratsopon07@gmail.com | May 19, 2020 6:37 PM | 76.91.252.167 | Data room disclaimer accepted |
| 42610 | cchanaratsopon07@gmail.com | Jun 4, 2020 1:16 AM | 76.91.8.241 | Data room disclaimer accepted |
| 32948 | cchanaratsopon07@gmail.com | Jun 10, 2020 6:07 PM | 2600:387:8:7::b0 | Data room disclaimer accepted |
| 16400 | cchanaratsopon07@gmail.com | Jul 9, 2020 5:17 PM | 76.91.8.241 | Data room disclaimer accepted |
| 16396 | cchanaratsopon07@gmail.com | Jul 9, 2020 5:24 PM | 76.91.252.167 | Data room disclaimer accepted |
| 16326 | cchanaratsopon07@gmail.com | Jul 10, 2020 7:28 PM | 76.91.252.167 | Data room disclaimer accepted |

62.    Based on these explicit contractual commitments, and the notice that he reviewed and acknowledged before accessing the Dataroom, Chanaratsopon knew that the Thrasio information on the Dataroom was confidential, and he had a duty not to use that information for any purpose other than evaluating an investment in Thrasio.

63.    All told, between March 2019 and July 2020, Chanaratsopon downloaded a total of 1,700 Thrasio files from the Dataroom.

64.    More than a thousand of these files consisted of the Standard Diligence Process and Standard Integration Process documents. Chanaratsopon bulk downloaded these process documents multiple times.

**V.    CHANARATSOPON IMPROPERLY EXPLOITS THE TRADE SECRETS TO FOUND BOOSTED**

65.    Chanaratsopon started downloading and studying large portions of the Dataroom over six months before forming Boosted, with downloads taking place in March 2019, May 2019, July 2019, and August 2019.

66.    Chanaratsopon and his co-founder incorporated Boosted shortly thereafter, in or around December 2019.

67.     Chanaratsopon and his co-founder hired Boosted's first employee at around the same time.

68.     The Internet Archive first captured a snapshot of Boosted's website in or around January 2020.  This initial capture memorializes that shortly following formation, Boosted was boasting that it could complete an acquisition within 45 days – almost identical to Thrasio's historically-advertised target timeframe of 43 days, even though at the time, Boosted had no track record or experience in the acquisition of Third-Party Sellers at this time.  Boosted's website continues to make this representation, and also touts its systematized and rigorous due diligence process – again, almost identical to the model Thrasio pioneered and developed.

69.     Chanaratsopon conducted another bulk download of large portions of the Thrasio Dataroom in May 2020 – *after* he had founded Boosted, launched its website, and hired its first employees.

70.     Chanaratsopon also accessed documents in the Dataroom in June and July 2020.

71.     Meanwhile, Chanaratsopon was working to establish Boosted.  Boosted hired additional employees in spring and summer 2020, and announced its successful Series A funding round in September 2020.

72.     The full extent of Chanaratsopon and Boosted's misappropriation will be revealed in discovery, but there can be no doubt that Chanaratsopon and Boosted have misappropriated Thrasio's Standard Diligence Process and the Standard Integration Process, and have used it to unfairly compete with Thrasio.  Indeed, Chanaratsopon would not have been able to launch Boosted's business in the time that he did without stealing the confidential, proprietary business processes that were developed by and belong to Thrasio.

## COUNT I
## VIOLATION OF DEFEND TRADE SECRETS ACT,
## 18 U.S.C. §§ 1832, 1836 *ET SEQ.*

73.     Thrasio incorporates by reference all other allegations of this Complaint as if fully set forth herein.

74.     Thrasio owns certain trade secrets, including the Standard Diligence Process and the Standard Integration Process.  This proprietary trade secret information relates to Thrasio's business, which includes the sale of goods over the internet, through interstate or foreign commerce.

75.     Thrasio has at all times taken reasonable measures to keep such trade secret information secret and confidential.  These efforts include, but are not limited to, the use of passwords and encryption to protect data on its computers and servers, and the use of confidentiality agreements and non-disclosure agreements to require employees, non-employee service providers, and potential and actual investors to maintain the secrecy of Thrasio's confidential information.  Thrasio does not disclose its trade secrets or other proprietary or confidential information to any third parties except where absolutely necessary, and then only pursuant to a strict nondisclosure agreement.  In this case, Thrasio disclosed its trade secrets to Upper90 only under conditions of strict secrecy.

76.     Due to these security measures, Thrasio's trade secrets are not available for others to use through any legitimate means.

77.     Thrasio's trade secrets derive independent value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

78.      In violation of Thrasio's rights, Chanaratsopon misappropriated Thrasio's confidential and proprietary trade secret information in the improper and unlawful manner alleged herein in order to operate a directly competitive business, Boosted, and serve as its CFO.

79.     Chanaratsopon's misappropriation of Thrasio's confidential and proprietary trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

80.     On information and belief, if Chanaratsopon's actions to operating Boosted are not enjoined, it will continue to misappropriate and use Thrasio's trade secret information for its own benefit and to Thrasio's detriment.

81.     As the direct and proximate result of Chanaratsopon's conduct, Thrasio has suffered and, if Chanaratsopon's conduct via Boosted is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be determined at trial.

82.     Because Thrasio's remedy at law is inadequate, it seeks, in addition to damages, permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information from further use or disclosure.

83.     Thrasio is also entitled to an award of exemplary damages and recovery of its attorneys' fees incurred herein.

<u>**COUNT II**</u>
**VIOLATION OF TEXAS UNIFORM TRADE SECRETS ACT, TEX. CIV. PRAC. & REM. CODE §§ 134A.001 *ET. SEQ.***

84.     Thrasio incorporates by reference all other allegations of this Complaint as if fully set forth herein.

85.     Thrasio's Standard Diligence Process and the Standard Integration Process constitute trade secrets under Texas Civil Practice & Remedies Code Ann. § 134A.002(6).  This information comprises one or more formulas, patterns, compilations, programs, devices, methods, techniques, and/or processes that derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their use or disclosure.

86.     Thrasio has at all times taken reasonable measures to keep such trade secret information secret and confidential.  These efforts include, but are not limited to, the use of passwords and encryption to protect data on its computers and servers, and the use of confidentiality agreements and non-disclosure agreements to require employees, non-employee service providers, and potential and actual investors to maintain the secrecy of Thrasio's confidential information.  Thrasio does not disclose its trade secrets or other proprietary or confidential information to any third parties except where absolutely necessary and then only

pursuant to a strict nondisclosure agreement.  In this case, Thrasio disclosed its trade secrets to Upper90—and through Upper90 to Chanaratsopon—under conditions of strict secrecy.

87.      Chanaratsopon was only granted access to the Dataroom containing Thrasio's proprietary and confidential information as a function of his position as an indirect investor in Thrasio.  Chanaratsopon then co-founded Boosted and serves as its CFO.  As a result, Chanaratsopon knew, or should have known under the circumstances, that the information and computer files he misappropriated from the Upper90 Dataroom, through his actions as alleged herein, were Thrasio's trade secrets.

88.      Moreover, as set forth herein, Chanaratsopon has at all times known and had reason to expect that his knowledge of Thrasio's trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and refrain from use thereof.

89.      Upon information and belief, Chanaratsopon has used or intends to use or disclose Thrasio's trade secrets for the purpose of competing with, or otherwise harming, Thrasio, through his involvement and operation of Boosted.

90.      In violation of Thrasio's rights, Chanaratsopon misappropriated Thrasio's confidential and proprietary trade secret information in the improper and unlawful manner alleged herein by using this information to found and operate Boosted.

91.      As a direct and proximate result of Chanaratsopon's conduct, Thrasio is threatened with injury and has been injured in an amount that will be proven at trial.  Thrasio has also incurred, and will continue to incur, additional damages, costs and expenses, including attorney's fees, as a result of Chanaratsopon's misappropriation.  As a further proximate result of the misappropriation and use of Thrasio's trade secrets, Chanaratsopon has been unjustly enriched.

92.      Chanaratsopon's conduct is continuing to cause harm for which Thrasio has no adequate remedy at law.  Unless enjoined by order of this Court, Chanaratsopon, through the continued operation of Boosted, will continue to misappropriate and use Thrasio's trade secret information for his own benefit and to Thrasio's detriment.

93.     Pursuant to Texas Civil Practice & Remedies Code Ann. § 134A.003(a), Thrasio is entitled to an injunction against the misappropriation and continued threatened misappropriation of trade secrets as alleged herein and further asks the Court to enjoin Chanaratsopon from using or disclosing any of the trade secret information misappropriated from Thrasio and to require Chanaratsopon to return all copies of such information to Thrasio.

94.     The aforementioned acts of Chanaratsopon were willful, malicious, and fraudulent. Thrasio is therefore entitled to exemplary damages pursuant to Texas Civil Practice & Remedies Code Ann. § 134A.004(b) in an amount not exceeding twice any award made under § 134A.004(a).

95.     Pursuant to Texas Civil Practice & Remedies Code Ann. § 134A.005(b), Thrasio is also entitled to recover its court costs and reasonable and necessary attorneys' fees for Defendants' willful, malicious, and fraudulent conduct as described above.

<u>COUNT III</u>
**MISAPPROPRIATION OF CONFIDENTIAL INFORMATION (COMMON LAW)**

96.     Thrasio incorporates by reference all other allegations of this Complaint as if fully set forth herein.

97.     Thrasio's Standard Diligence Process and the Standard Integration Process constitute proprietary and confidential information at the core of Thrasio's business. This data is generally unknown to the public and Thrasio has taken reasonable efforts to maintain its secrecy. Thrasio created and developed these streamlined procedures for effectuating acquisitions of Third-Party Sellers through the significant investment of time, labor, expertise, and capital investment.

98.     Chanaratsopon acknowledged the confidential nature of this information by signing nondisclosure agreements before obtaining the ability to access the Dataroom. Further, Chanaratsopon acknowledged his ongoing confidentiality obligations and use restrictions on at least thirteen separate occasions between December 2019 and July 2020.

99.     Despite this, Chanaratsopon misused his position as an indirect investor to Thrasio in order to improperly access and misappropriate Thrasio's confidential information for his own benefit. Upon information and belief, Chanaratsopon implemented Thrasio's Standard Diligence

Process and Standard Integration Process for his own benefit to found a competing company, Boosted.

100.    Any use of Thrasio's information outside of the context of evaluating the company for potential investment is not authorized by Thrasio.  Had Thrasio been aware of Chanaratsopon's intentions to use its confidential information to form a competing business, Thrasio would not have provided Chanaratsopon access to the Dataroom.

101.    By misappropriating Thrasio's confidential information, Chanaratsopon was able to form a directly competitive business without incurring the expense and efforts needs to develop the confidential information central to the business's operation.  Use of Thrasio's confidential information allowed Chanaratsopon to kickstart Boosted's operations, acquiring Third-Party Sellers and attracting substantial investors far sooner than Boosted would have been able to do without using this misappropriated information.

102.    As a direct and proximate result of Chanaratsopon's actions, Thrasio has suffered and continues to suffer damages.  Chanaratsopon has also been unjustly enriched through his use of Thrasio's confidential information.

## **PRAYER FOR RELIEF**

WHEREFORE, Thrasio prays for judgment against Chanaratsopon as follows:

a.      That the Court render a final judgment in Thrasio's favor and against Chanaratsopon on all claims alleged in this Complaint;

b.      For damages in an amount to be proven at trial;

c.      For permanent injunctive relief;

d.      For a constructive trust over all information, patent applications, patents, technology, products and other materials in the possession, custody, or control of Chanaratsopon that wrongfully constitute, contain, were based on, and/or derived in whole or in part from the use of Thrasio's confidential and proprietary information and/or trade secrets;

e.      For restitution;

f.      For exemplary damages;

g.      For costs of suit incurred herein;

h.      For prejudgment interest;

i.      For attorneys' fees and costs; and

j.      For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues, claims, and causes of action triable by a jury.

Dated:  February 12, 2021                    Respectfully submitted,

_/s/ Collin J. Cox_____
Collin J. Cox
State Bar No. 24031977
ccox@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas  77002
Tel. (713) 632-8000
Fax (713) 632-8002

COOLEY LLP
Philip M. Bowman, _pro hac vice forthcoming_
pbowman@cooley.com
Nicholas A. Flath, _pro hac vice forthcoming_
nflath@cooley.com
55 Hudson Yards
New York, New York 10001
Tel. (212) 479-6000
Fax (212) 479-6275

ATTORNEYS FOR PLAINTIFF THRASIO