1  SANFORD L. MICHELMAN (SBN 179702)
   smichelman@mrllp.com
2  TIMOTHY J. GORRY (SBN 143797)
   tgorry@mrllp.com
3  ALEXANDER R. SAFYAN (SBN 277856)
   asafyan@mrllp.com
4  CAMILLE R. YONA (SBN 329486)
   cyona@mrllp.com
5  **MICHELMAN & ROBINSON, LLP**
   10880 Wilshire Boulevard, 19th Floor
6  Los Angeles, California 90024
   Telephone:  (310) 299-5500
7  Facsimile:   (310) 299-5600

8  Attorneys for Defendant
   CHARLES CHANARATSOPON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THRASIO, LLC,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>CHARLES CHANARATSOPON,<br><br>　　　　Defendant. | Case No. 2:21-cv-02422-CBM-SK<br>Related to Case No. 2:21-cv-01337-CBM-SK<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:　　　November 9, 2021<br>Time:　　　10:00 a.m.<br>Courtroom: 8B, 8th Floor<br><br>[Declarations of Charles Chanaratsopon and Sanford L. Michelman and (Proposed) Order submitted herewith]<br><br>Complaint Filed: February 12, 2021<br>Trial Date: None set |

# NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND THE PARTIES' ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on November 9, 2021 at 10:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Consuelo B. Marshall, in Courtroom 8B, 8th Floor, of the United States District Court, Central District of California, located at 350 W. 1st Street, Los Angeles, California 90012, Defendant Charles Chanaratsopon ("Chanaratsopon") will and hereby does move, pursuant to Rule 11 of the Federal Rules of Civil Procedure, for an order imposing sanctions against Plaintiff Thrasio, LLC ("Thrasio") and its counsel for filing a complaint against Chanaratsopon that has no factual basis and was filed for an improper purpose.

In accordance with the 21-day "safe harbor" requirement of Rule 11, this motion and supporting declarations were served on Thrasio and its counsel at least 21 days prior to being filed. The parties also met and conferred regarding the issues in this motion in writing and telephonically. To that end, this Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place via written correspondence on March 18 and 25, 2021 and then via telephone on March 26, 2021.

This Motion is based on this notice of motion and motion, the accompanying memorandum of points and authorities, the declarations of Charles Chanaratsopon and Sanford L. Michelman, all pleadings and papers on file with the Court, and such other matters as the Court may consider at or before the hearing on this Motion.

Date: October 6, 2021

**MICHELMAN & ROBINSON, LLP**

By: */s/ Sanford L. Michelman*
Sanford L. Michelman
Timothy J. Gorry
Alexander R. Safyan
Camille R. Yona
Attorneys for Defendant
CHARLES CHANARATSOPON

1

**DEFENDANT'S MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11**

# **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY............................ 1

    A.  The Complaint's Allegations .................................................................... 1

    B.  Thrasio Publicly Broadcasts the Very Information It Alleges Is "Secret" ....... 3

    C.  Chanaratsopon Sends a Comprehensive Courtesy Rule 11 Letter, Which Thrasio Disregards ................................................................................... 8

III. ARGUMENT ....................................................................................................... 8

    A.  Thrasio's Complaint Is Baseless and Was Filed Without a Reasonable and Competent Inquiry ............................................................................ 10

    B.  Thrasio's Complaint Was Filed for an Improper Purpose ........................... 13

    C.  The 21-Day "Safe Harbor" Requirement Has Been Met............................. 14

IV. CONCLUSION.................................................................................................. 15

# TABLE OF AUTHORITIES[1]

Page(s)

**Federal Cases**

*Accresa Health LLC v. Hint Health Inc.*,
  2020 WL 3637801 (E.D. Tex. July 6, 2020) ................................................................10

*Christian v. Mattel, Inc.*,
  286 F.3d 1118 (9th Cir. 2002) ........................................................................1, 9, 10, 13

*Cooter & Geill v. Hartmax Corp.*,
  496 U.S. 384 (1990) ......................................................................................................9

*Holgate v. Baldwin*,
  425 F.3d 671 (9th Cir. 2005) ...................................................................................10, 13

*MWK Recruiting, Inc. v. Jowers*,
  2019 WL 7761445 (W.D. Tex. July 29, 2019) ........................................................11, 12

*Phazr, Inc. v. Ramakrishna*,
  2020 WL 5526554 (N.D. Tex. Sept. 14, 2020) ............................................................12

*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*,
  637 F.3d 604 (5th Cir. 2011) .......................................................................................12

*Townsend v. Holman Consulting Corp.*,
  929 F.2d 1358 (9th Cir. 1990) .................................................................................9, 13

*Truesdell v. S. Cal. Permanente Med. Grp.*,
  293 F.3d 1146 (9th Cir. 2002) .....................................................................................14

*Veronica Foods Co. v. Ecklin*,
  2017 WL 2806706 (N.D. Cal. June 29, 2017) .............................................................12

*Zaldivar v. City of Los Angeles*,
  780 F.2d 823 (9th Cir. 1986) .........................................................................................9

**Other State Cases**

*Thrasio, LLC v. Boosted Commerce Inc.*,
  Case No. 2:21-cv-01337-CBM-SK ...............................................................................8

---

[1] All emphases in this brief are added and internal citations omitted unless stated otherwise.

**Federal Statutes**

18 U.S.C.
   § 1839(3) ........................................................................................................... 10
   § 1839(5) ..................................................................................................... 10, 12

DTSA ................................................................................................................. 10, 11, 12

federal Defend Trade Secrets Act ............................................................................... 10

**Other State Statutes**

Tex. Civ. Prac. & Rem. Code
   §§ 134A.002(3) .................................................................................................. 12
   §§ 134A.002(3), (6) ........................................................................................... 10

**Other Authorities**

Federal Rules of Civil Procedure
   Rule 5 .................................................................................................................. 14
   Rule 11 ............................................................................................................. 1, 8
   Rule 11(b)(1) ........................................................................................... 9, 13, 15
   Rule 11(b)(3) ........................................................................................... 9, 13, 15
   Rule 11(c)(2) ....................................................................................................... 14
   Rule 11(c) ....................................................................................................... 1, 15
   Rule 12(b)(6) ........................................................................................................ 3

DEFENDANT'S MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11

# MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Charles Chanaratsopon ("Chanaratsopon") brings this motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure against Plaintiff Thrasio, LLC ("Thrasio") and its counsel.

## I. INTRODUCTION

"Filing a complaint in federal court is no trifling undertaking." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002). "An attorney's signature on a complaint is tantamount to a warranty that the complaint is well grounded in fact and existing law … and that it is not filed for an improper purpose." *Id.* Thrasio and its counsel violated this core principle, embodied in Rule 11, by filing a complaint against Chanaratsopon that is factually baseless, that was filed without a reasonable and competent inquiry (which would have revealed that it is factually baseless), and that was filed for an improper purpose—namely to harm Chanaratsopon and the company he co-founded that competes with Thrasio, Boosted Ecommerce, Inc. ("Boosted"). Chanaratsopon gave Thrasio multiple opportunities to withdraw its frivolous lawsuit, including by sending an initial courtesy letter to its counsel and giving Thrasio an opportunity to respond *prior* to serving this motion in accordance with Rule 11's "safe harbor" requirement. Thrasio refused to withdraw or otherwise modify its complaint. Accordingly, for the reasons discussed below, Chanaratsopon requests that the Court sanction Thrasio and its counsel pursuant to Rule 11(c) and order Thrasio to pay Chanaratsopon's attorneys' fees and costs incurred in having to bring this motion.[2]

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. The Complaint's Allegations

Thrasio is in the business of buying third-party sellers' companies on Amazon.com and consolidating them under Thrasio's umbrella. (Compl. ¶ 2.) Thrasio revamps the third-party sellers' listings and then sells their products itself on Amazon's e-commerce platform. (*Id.*) This business strategy is referred to in the investing world as a "roll-up" strategy (i.e.,

---

[2] The exact amount of Chanaratsopon's attorneys' fees and costs will be detailed in a supporting declaration from his counsel, Sanford L. Michelman, submitted with Chanaratsopon's reply on this motion.

Thrasio, and companies like it, "roll up" smaller companies and consolidate them to create economies of scale). (*See* Declaration of Charles Chanaratsopon ("Chanaratsopon Decl.") ¶ 3.) The Amazon roll-up market is a booming, *billion-dollar* industry, with dozens of venture capital-backed companies (like Thrasio and Boosted) vying to purchase the best third-party sellers on Amazon. (*See id.*, Exs. A (11/18/2020 Forbes article) & C (3/2/2021 Crunchbase article).)

Thrasio asserts that its "success derives from two proprietary business processes": a "Standard Diligence Process" and a "Standard Integration Process." (Compl. ¶¶ 2-4.) The so-called "Standard Diligence Process" is Thrasio's process "to determine whether to acquire a Third-Party Seller" and "is based on the use of template forms, checklists, and document requests, as well as a proprietary 'keyword' analysis of how the target's products rank against other products in Amazon search results." (*Id.* ¶¶ 3, 28-29.) The so-called "Standard Integration Process" is Thrasio's process "for the efficient integration and on-boarding of newly acquired Third-Party Sellers," which "allows each new business to be upgraded to adopt Thrasio's gold standard processes, including for supply chain, marketing, search keyword optimization, and trademark protection." (*Id.* ¶¶ 4, 30-31.)

Thrasio alleges that it keeps documents containing its "proprietary and confidential information," including the Standard Diligence Process and Standard Integration Process, in a dataroom that is hosted by a venture capital firm called Upper90 and that is intended to be accessed by investors of Thrasio. (Compl. ¶¶ 8-9, 42-44, 49-51.)

Thrasio acknowledges the growing competition in the Amazon roll-up market and Thrasio's need to "race against other sophisticated competitors to acquire promising Third-Party Sellers" in order "to maintain its place in the market." (*Id.* ¶¶ 6, 25.) Indeed, Thrasio's co-founder has publicly stated that Thrasio's "*overriding concern*" is preserving its market position as "an absolutely dominant player in this space." (Chanaratsopon Decl., Ex. B (2/10/2021 Financial Times article).) To preserve its market position, Thrasio here has illicitly targeted a rising competitor, Chanaratsopon's Boosted, which recently raised $87 million in investments from a combination of prominent investment firms and individuals.

(*Id.* ¶ 5.)

The *only* connection between Thrasio and Boosted that forms the basis for Thrasio's complaint is that Chanaratsopon was an indirect investor in Thrasio who—legally, properly, and with consent—accessed Thrasio's confidential information *around the time* he co-founded Boosted. Thrasio readily admits that, as a potential and actual investor in Thrasio, Chanaratsopon had proper access to Thrasio's "dataroom" that housed its "confidential" documents. (Compl. ¶¶ 50-53.) Thrasio acknowledges that Chanaratsopon accessed/downloaded those documents around the times of his three separate investments in Thrasio in March 2019, September 2019, and June 2020. (*Id.* ¶¶ 57, 65.) Thrasio then makes the absurd leap that simply because Chanaratsopon accessed Thrasio's "dataroom" in the months surrounding the incorporation of Boosted (in December 2019), Chanaratsopon and Boosted *must have* misappropriated Thrasio's confidential information. (*See id.* ¶¶ 65-71.) Tellingly, Thrasio does not allege ***a single use*** of its information by Chanaratsopon or Boosted. Thrasio's complaint points *solely* to a statement on Boosted's website in January 2020 stating that Boosted can complete an acquisition within 45 days, which Thrasio says was "almost identical" to its timeframe of 43 days, as "evidence" of the alleged misappropriation. (*See id.* ¶ 68.) That is farcical for multiple reasons, not the least of which is that Thrasio has *publicly advertised* its acquisition timeframe on its website and in multiple interviews (in fact, over *forty* similar companies advertise similar closing times on their websites). Thrasio then makes the completely conclusory allegation that "there can be no doubt that Chanaratsopon and Boosted have misappropriated Thrasio's Standard Diligence Process and the Standard Integration Process" because "Chanaratsopon would not have been able to launch Boosted's business in the time that he did without stealing [Thrasio's] confidential, proprietary business processes." (*Id.* ¶ 72.) This cursory and superficial pleading clearly is insufficient to withstand a Rule 12(b)(6) motion; more importantly, it is grounds for Rule 11 sanctions.

B. **Thrasio Publicly Broadcasts the Very Information It Alleges Is "Secret"**

Thrasio has openly, repeatedly, and publicly broadcast the very information it alleges

in its Complaint that it endeavors to keep secret. Thrasio's executives also have, on numerous occasions, admitted that the information is *not unique or proprietary*. Thrasio's co-founders and Chief Executives Carlos Cashman and Joshua Silberstein, Vice President of Acquisitions Ken Kubec, and Vice President of Amazon SEO Casey Gauss have all made numerous public statements in interviews that have been watched and/or listened to *thousands of times* that directly disprove any notion that Thrasio has kept its business methods and processes secret. In fact, these individuals seemingly cannot stop publicly boasting about the very information Thrasio here alleges Chanaratsopon and Boosted "misappropriated." These individuals have openly discussed, *inter alia*, what Thrasio looks for in potential acquisition targets; how Thrasio values these businesses to determine the monetary offer it will make; what Thrasio's diligence process entails; how Thrasio completes its acquisitions in 30-45 days; what Thrasio does to improve its acquisitions' products and listings; and even how prospective competitors can create *their own "mini-Thrasio"* and roll up third-party Amazon sellers just like Thrasio. The following are just a few of the many examples of Thrasio publicly broadcasting its alleged "trade secrets":

*Quiet Light Academy interview with Carlos Cashman (co-CEO)*, July 25, 2019
https://www.youtube.com/watch?v=S4Rb3ti0djo&feature=youtu.be

- Mr. Cashman explains that Thrasio identifies potential acquisition targets by looking for products on Amazon that have a "top ranking," "great ratings," and "a good number of reviews"
- Mr. Cashman discloses that "what matters [most] is the listing and its position relative to its competitors in the key word space" when determining whether a seller is worth targeting

*FeedbackWhiz interview with Ken Kubec (VP of Acquisitions)*, July 18, 2019
https://www.youtube.com/watch?v=pxjY1wXUlp0&t=223s

- Mr. Kubec discusses Thrasio's acquisition process for U.S.-based businesses by explaining that Thrasio's deals are structured as "asset purchases," with Thrasio buying "everything associated with that asset," including the "trademark," the Amazon "seller central account,"[3] "websites, etc."

---

[3] Amazon seller central is the interface merchants use to market and sell their products directly to consumers through Amazon. Amazon sellers use seller central to list their

- Mr. Kubec advises that Thrasio's "median multiple" in valuing an acquisition target is "around 2.2 times" revenue and that Thrasio "align[s] with owners and give[s] additional compensation on top of that multiple" in the form of an "earn out component … which might bring the total transaction value to 3 times or 3-and-a-half times trailing 12 months"

- In response to a question asking him to describe the process of consummating a deal once a third-party seller accepts Thrasio's purchase offer, Mr. Kubec states:
    - "the first step" is "both parties sign what's called a letter of intent or an LOI" …
    - "once the LOI is signed," Thrasio's "diligence team … kick into high gear and work one-on-one with the sellers or the seller/broker on just gaining access to seller central … reconciling financial statements … looking at supplier contracts … verifying trademarks … ***all of the things that if you were buying a business you'd want to check the boxes***" …
    - "that process … take[s] 30 days" and "at the end of that 30 days … we formalize a legal binding contract which is the asset purchase agreement" …
    - "the way to think about it is signed letter of intent, 30 days later whatever the purchase price is, the agreed upon upfront guaranteed cash portion gets paid out once the APA is signed … and then there's another … 20 or 30 day migration period" where "we take on the seller central account, we start to migrate the inventory" and "start ordering new inventory"

*Orange Klik interview with Ken Kubec*, August 30, 2019
https://www.youtube.com/watch?v=VDRxN-ieh5w

- Mr. Kubec discloses that Thrasio "look[s] for businesses doing anywhere from 1 to 15 million in revenue on a trailing 12 month basis" and particularly "businesses that are doing 2 million a year in revenue on one SKU"

- Mr. Kubec states that Thrasio "look[s] across all products categories," is "not focused on vertical categories," and "look[s] for stable demand products" that are "ranked in the top five, top ten organically for a majority of the search term volume," has "strong product ratings in terms of the product star system," and has a "defensible review count"; these targets are what Thrasio calls "beachfront real estate"

- Mr. Kubec expands on Thrasio's valuation metric, stating that its "historical average has been 2.25 times" the "trailing 12 months of … seller's discretionary earnings" and it "also structure[s] earn outs" for the seller of "another 1 to 1.5 times … so the

products, manage their inventory, set their pricing, communicate with buyers, review their account health, and maintain all other essential information about their business. *See* https://sell.amazon.com/sell.html?ref_=sdus_soa_start_n.

5

**DEFENDANT'S MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11**

total purchase price [is] 3 times, 3-and-a-half-times"

*Tom Wang interview with Ken Kubec*, May 25, 2020
https://www.youtube.com/watch?v=QAvaZo1G1Ag

- Mr. Kubec reaffirms that "the deals are typically structured as an asset purchase" where Thrasio buys "all the assets that are required to run the business so that would be your trademarks, your amp, your seller central account, all your social media accounts … anything that is required to run the business"; this is "what allows [Thrasio] to move so quickly through diligence is we don't assume any prior liabilities, we're just buying the assets we're not buying the whole company"

- In response to a question asking whether Thrasio has a rule for "margin ranges" and "percentage of ad spend" in its acquisition targets, Mr. Kubec states that "most businesses we've looked at rung at anywhere from 18 to 25 percent net margins" and "in terms of ad spend percentage of revenue that range is … 7 to 10 percent"; "if you're just doing straight COGS … anywhere from 20 to 30 percent of revenue"

*This Week in Startups interview with Joshua Silberstein (co-CEO)*, August 11, 2020
https://www.youtube.com/watch?v=xN86AwK5qiI

- Mr. Silberstein explains that Thrasio's "integration process" involves giving the products "a facelift, making them more attractive to the consumer … taking into account what the consumer has said in the past in the reviews and upgrading the products," and "often … cutting the prices because we're able to source them less expensively"

*Aaron Watson interview with Casey Gauss (VP of Amazon SEO)*, November 8, 2020
https://www.youtube.com/watch?v=q5hyFoyxT1s

- Mr. Gauss explains that for Thrasio's potential acquisition targets, the main components of Amazon SEO (search engine optimization) are "visibility and conversion"; the "product title has to be very specific" with "keywords in the beginning of the title" (visibility), and if people search for a product and go to a seller's page, they must actually buy the product (conversion)

\* \* \*

These are just some of the public disclosures Thrasio's executives have made. In addition, these same executives have made a number of public admissions that *nothing Thrasio does is unique or proprietary* and that its business relies on *publicly available data from Amazon*. The following are a few examples:

*Quiet Light Academy interview with Carlos Cashman (co-CEO)*

- Mr. Cashman states that "in terms of … do we have a particular twist on the market ***no I don't think we do*** …."

- Mr. Cashman references that what makes the Amazon e-commerce platform particularly attractive for Thrasio is that "60%, 56% of searches [for] products are just start[ing] on Amazon" and "among millennials and below … 76% product searches are starting on Amazon"

*This Week in Startups interview with Joshua Silberstein (co-CEO)*

- In response to a question asking when Thrasio analyzes a company to buy whether it is "hitting an Amazon API [application programming interface]" or "looking at the public-facing data that we can all see," Mr. Silberstein responds, "***yeah, yeah absolutely***"

- When the interviewer concludes the question by asking, "is there any information that you can't get on the public facing site that they [third parties] could even use," Mr. Silberstein responds, "***not really***"

*FeedbackWhiz interview, Orange Klik interview, and Tom Wang interview with Ken Kubec (VP of Acquisitions)*

- In two separate interviews nearly a year apart (FeedbackWhiz and Tom Wang), Mr. Kubec states—almost verbatim—that "the beauty of Amazon is you have ***a canonical source of data which is seller central***" that gives Thrasio the ability to "move quickly through … diligence"; "***it's the same systems over and over again that we're diligencing the financials on … seller central***"

- In the FeedbackWhiz interview, Mr. Kubec comments that Thrasio's diligence process is "all of the things that … if you were buying a business you'd want to check the boxes"

- In the Orange Klik interview, Mr. Kubec proclaims that "***there's no formulaic approach we take***, it's really on an individual basis"

- In the Tom Wang interview, when asked about Thrasio's business, Mr. Kubec answers, "***it's pretty simple*** … there's over 30,000 brands doing over a million a year in revenue on Amazon, that's kind of our target market and … we acquire them, we stabilize them over a migration period, … [do] checks and balances once we take over the brand and then we seek [ ] avenues of growth"

*Aaron Watson interview with Casey Gauss (VP of Amazon SEO)*

**DEFENDANT'S MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11**

- Mr. Gauss admits that Thrasio's business model "***is not an original idea***" and that "now with Thrasio blowing up, there's way more competitors"

\* \* \*

Thus, at bottom, Thrasio has sued Chanaratsopon and Boosted for "misappropriating" supposed "trade secrets" that Thrasio has both *publicly broadcasted* and admitted are *not unique or proprietary*.

### C. **Chanaratsopon Sends a Comprehensive Courtesy Rule 11 Letter, Which Thrasio Disregards**

On February 12, 2021, Thrasio filed virtually identical lawsuits against Chanaratsopon in Texas and Boosted in California. (Declaration of Sanford L. Michelman ("Michelman Decl.") Exs. A & B.) The Texas action was subsequently transferred to this judicial district and deemed related to the California Action (*see Thrasio, LLC v. Boosted Commerce Inc.*, Case No. 2:21-cv-01337-CBM-SK). (*Id.* ¶ 3.)

On March 18, 2021, the undersigned counsel sent a comprehensive courtesy letter to Thrasio's counsel informing them of the issues with Thrasio's complaint(s) and inviting them to meet and confer in advance of a Rule 11 motion. (*See* Michelman Decl., Ex. C (3/18/2021 letter).) Thrasio's counsel refused to withdraw or otherwise modify the complaint(s) in response to this letter. (*Id.* ¶ 5.) Chanaratsopon then served this motion in accordance with Rule 11's 21-day "safe harbor" requirement (Boosted has served a similar motion in the other action). (*Id.*) Chanaratsopon will file this motion only after the 21-day period has expired and if Thrasio again refuses to withdraw its baseless and improper complaint.[4] (*Id.* ¶ 6.)

## III. ARGUMENT

Rule 11 states, in relevant part:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating

---

[4] Though it is not legally relevant because (as shown below) Thrasio's complaint is factually baseless, Chanaratsopon and Boosted of course deny the allegations in Thrasio's complaint that they engaged in *any* wrongdoing by using any of Thrasio's purported "trade secrets" for any improper purpose. (Chanaratsopon Decl. ¶ 7.)

> it—an attorney … certifies that to the best of the [attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; [and]
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b)(1), (3).

"Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and not interposed for any improper purpose." *Cooter & Geill v. Hartmax Corp.*, 496 U.S. 384, 393 (1990). Critically, "[t]he attorney has a duty **prior** to filing a complaint not only to conduct a reasonable factual investigation, but also to perform adequate legal research that confirms whether the theoretical underpinnings of the complaint are warranted by existing law or a good faith argument for an extension, modification or reversal of existing law." *Christian*, 286 F.3d at 1127.

Ninth Circuit precedent establishes that sanctions must be imposed if the paper at issue is frivolous *or* if it is filed for an improper purpose. *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990). A paper is "frivolous" if it is "both baseless and made without a reasonable and competent inquiry." *Id.* An "improper purpose" does not require bad faith; like frivolousness, it is judged by an objective standard. *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 830-31 (9th Cir. 1986). While "[e]ither the improper purpose or frivolousness ground is sufficient to sustain a sanction," when a complaint is at issue "a determination of improper purpose must be supported by a determination of frivolousness." *Townsend*, 929 F.2d at 1362. And as to frivolousness, when "the complaint is the primary focus of Rule 11 proceedings, a district court must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually baseless from an objective perspective, and (2) if the attorney has conducted a reasonable and competent

inquiry before signing and filing it." *Christian*, 286 F.3d at 1127; *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005).

### A. Thrasio's Complaint Is Baseless and Was Filed Without a Reasonable and Competent Inquiry

Thrasio's primary claims are for trade secret misappropriation under the federal Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA") by Chanaratsopon. Both the DTSA and TUTSA require a plaintiff to establish (1) the existence of a trade secret, and (2) misappropriation of that secret. *See Accresa Health LLC v. Hint Health Inc.*, 2020 WL 3637801, at *5-6 (E.D. Tex. July 6, 2020). The DTSA defines a "trade secret" as "financial, business, scientific, technical, economic, or engineering information" where: (A) the owner "has taken reasonable measures to keep such information secret"; and (B) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). The DTSA defines "misappropriation" as, *inter alia*: (A) the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"; or (B) "disclosure or use of a trade secret of another without express or implied consent by a person who … at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5).

The TUTSA's definitions of "trade secret" and "misappropriation" are substantially identical to the definitions of those terms in the DTSA. *See* Tex. Civ. Prac. & Rem. Code §§ 134A.002(3), (6); *Accresa Health*, 2020 WL 3637801, at *5-6. Given the substantial similarities in claims under the DTSA and TUTSA, courts often analyze them together. *See,*

*e.g., MWK Recruiting, Inc. v. Jowers*, 2019 WL 7761445, at *11 (W.D. Tex. July 29, 2019).

At its core, the first element of a trade secret misappropriation claim is that the alleged trade secret information is, in fact, secret. Both the DTSA and TUTSA require a plaintiff to demonstrate that the information is not "generally known" *and* that the owner has reasonably attempted to maintain its secrecy. Thrasio objectively cannot do either here. Thrasio's alleged "trade secrets" are lumped into two generic categories: (1) its "Standard Diligence Process"; and (2) its "Standard Integration Process." Nothing in either of these categories is a secret. Literally *every* company that acquires a third-party business conducts diligence on the business and then integrates the business using its own "gold standard." That is the process for *every* company that performs "roll-ups," including Thrasio, Boosted, and all of their competitors. Thrasio's own executive Ken Kubec recognizes this fact, as he has publicly admitted that Thrasio's diligence process is "all of the things that … if you were buying a business you'd want to check the boxes."

There are numerous articles on the internet that describe how to perform a "roll-up" with step-by-step guides that universally discuss a diligence process and an integration process.[5] Even more pointedly, there are articles on the internet published by the major brokers who specifically help companies—*including Thrasio*—acquire third-party Amazon businesses that offer step-by-step guides to acquire such businesses.[6] Thus, any entity that wants to compete with Thrasio in the Amazon roll-up market can read one of these guides— which tell the entire world what Thrasio's "Standard Diligence Process" and "Standard Integration Process" entails—and compete with Thrasio. There is simply nothing confidential or proprietary about a diligence process or integration process that businesses

---

[5] *See, e.g.*, https://www.entrepreneur.com/article/283678 ("A Secret Tactic for Quick Growth: The Roll-up"); https://www.forbes.com/sites/georgedeeb/2018/10/02/how-to-roll-up-several-companies-into-one/?sh=2586bff17466 ("How To Roll-Up Several Companies Into One"); https://medium.com/the-innovation/roll-up-strategy-how-to-create-value-b7fe70efd9a0 ("Roll-Up Strategy: How To Create Value").

[6] *See, e.g.*, https://empireflippers.com/buy-amazon-fba-business-step-by-step-guide/ ("Buying an Amazon FBA Business: A Step-by-Step Guide"); https://amzadvisers.com/due-diligence-when-buying-an-amazon-fba-business/ ("How To Do Due Diligence When Buying An Amazon FBA Business").

use every day and that anyone can look upon the internet at any time for free.

Equally fatal to Thrasio's trade secret misappropriation claims is the fact that Thrasio has been openly, repeatedly, and publicly disclosing its processes for over a year-and-a-half. Public disclosure is fatal to the existence of a trade secret and is reason alone for a court to dismiss a trade secret misappropriation claim outright. *See, e.g., Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 610-11 (5th Cir. 2011) (citing *Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336, 338 (Tex. 1964)) ("It is self-evident that the subject matter of a trade secret must be secret."); *Veronica Foods Co. v. Ecklin*, 2017 WL 2806706, at *14 (N.D. Cal. June 29, 2017) (citing *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009)) ("Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished …."). Thrasio cannot publicly broadcast its alleged "trade secrets" and at the same time sue one of its competitors for using those "trade secrets." To state the obvious, the "trade secrets" (which are not secrets in the first place, as discussed above) are not secrets if anyone can find them online. A simple YouTube search—which Chanaratsopon's counsel performed—reveals the multiple wide-ranging interviews cited above, in which Thrasio's executives voluntarily and enthusiastically broadcast Thrasio's "secrets" to thousands of people—including acquisition targets, investors, and competitors—in order to affirmatively publicize and market Thrasio's business. Thrasio's counsel could have, and should have, performed the same simple online search, which would have revealed the public nature of Thrasio's alleged trade secret information. By failing to do so, Thrasio's counsel did not do a reasonable and competent inquiry as required of them under Rule 11.

The second element of a trade secret misappropriation claim under the DTSA and TUTSA is "misappropriation." *See* 18 U.S.C. § 1839(5); Tex. Civ. Prac. & Rem. Code §§ 134A.002(3); *MWK Recruiting*, 2019 WL 7761445, at *13. Here, too, Thrasio objectively does not, and cannot, make the necessary showing. Thrasio utterly fails to demonstrate "*how* or *when* the defendant[] actually used [Thrasio's] trade secrets." *See Phazr, Inc. v. Ramakrishna*, 2020 WL 5526554, at *4-5 (N.D. Tex. Sept. 14, 2020)

Again, Thrasio admits that, as an investor in Thrasio, Chanaratsopon had legal and proper access to Thrasio's "dataroom" that housed its "confidential" documents. (Compl. ¶¶ 50-53.)  Thrasio acknowledges that Chanaratsopon accessed/downloaded those documents around the times of his three separate investments in Thrasio in March 2019, September 2019, and June 2020. (*Id.* ¶¶ 57, 65.)  Thrasio then makes the absurd leap that simply because Chanaratsopon accessed Thrasio's "dataroom" in the months surrounding the incorporation of Boosted (in December 2019), Chanaratsopon and Boosted *must have* misappropriated Thrasio's confidential information. (*See id.* ¶¶ 65-71.)  There are no ***facts*** demonstrating that Chanaratsopon or Boosted acquired Thrasio's confidential information by improper means (because they did not).  There are no ***facts*** demonstrating that Chanaratsopon or Boosted disclosed any of Thrasio's confidential information (because they did not).  There are no ***facts*** demonstrating that Chanaratsopon or Boosted improperly used any of Thrasio's confidential information (because they did not).  Thus, not only is Thrasio objectively unable to assert a factual basis that any of its "trade secrets" are secret, but it is unable to assert a factual basis that Chanaratsopon or Boosted did anything with its information that can be considered "misappropriation."  Thrasio is unable to assert this factual basis because no such basis exists.  Thrasio's complaint is therefore frivolous because it is both factually baseless and was filed without a reasonable and competent inquiry. *See Christian*, 286 F.3d at 1127; *Holgate*, 425 F.3d at 676.

### B. <u>Thrasio's Complaint Was Filed for an Improper Purpose</u>

As mentioned, it is sufficient to warrant an award of sanctions if a paper filed with the court is frivolous—which Thrasio's complaint is. *See Townsend*, 929 F.2d at 1362; Fed. R. Civ. P. 11(b)(3).  However, sanctions are also warranted here for the independent reason that Thrasio's complaint was also filed for an improper purpose. *See Townsend*, 929 F.2d at 1362; Fed. R. Civ. P. 11(b)(1).  Thrasio's lawsuit is a transparent attempt to maintain its "first-mover" advantage over a rising competitor in Boosted. (*See* Chanaratsopon Decl., Ex. B (2/10/2021 Financial Times article).)  Thrasio's executives have all publicly acknowledged that competition in the Amazon roll-up market is increasing and Thrasio is

extremely concerned with preserving its market position. (*See* supra, § II.B.) Chanaratsopon has been an investor in Thrasio since early 2019—*and he still retains those investments to this day*. (Chanaratsopon Decl. ¶ 4.) In other words, Chanaratsopon did not get out of his investments when he decided to create a competing business. Boosted was incorporated in December 2019—more than a year before Thrasio filed its lawsuits against Chanaratsopon and Boosted. (*Id.*) Not coincidentally, Thrasio's lawsuits came shortly after it was publicly announced that Boosted had raised $87 million in investments from a combination of prominent investment firms and individuals. (*Id.* ¶ 5.) Viewing Chanaratsopon and Boosted as a well-financed threat, and based on the tenuous link of Chanaratsopon being an investor in Thrasio, Thrasio decided to file public lawsuits against both Chanaratsopon and Boosted and send letters attaching the complaints to Boosted's investors. (*See id.* ¶ 6.) This was plainly done to harm Boosted's standing among its current (and future) investors and potential acquisition targets who will face competing offers from Thrasio and Boosted. Thrasio could have reached out directly to Chanaratsopon (its investor) and raised any legitimate concerns it had with Boosted's alleged use of its "trade secrets." Instead, Thrasio decided to take a "shoot first, ask questions later" approach and publicly sue Chanaratsopon and Boosted. The above facts objectively show that Thrasio's complaint was filed for an improper purpose, further justifying sanctions under Rule 11.

### C. The 21-Day "Safe Harbor" Requirement Has Been Met

Rule 11 requires a 21-day "safe harbor" period before a motion for sanctions can be filed. *See* Fed. R. Civ. P. 11(c)(2) ("The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper … is withdrawn or appropriately corrected within 21 days after service or within another time the court sets."). The purpose of the "safe harbor" period is "to give litigants an opportunity to remedy any alleged misconduct before sanctions are imposed." *Truesdell v. S. Cal. Permanente Med. Grp.*, 293 F.3d 1146, 1151 (9th Cir. 2002). Chanaratsopon's counsel did more than comply with the minimum "safe harbor" requirement. As indicated above, it first sent a comprehensive courtesy letter to Thrasio's counsel informing them of the issues with the

complaint(s) and inviting them to meet and confer in advance of a Rule 11 motion. (*See* Michelman Decl., Ex. C (3/18/2021 letter).) Chanaratsopon's counsel then served this motion on Thrasio's counsel with a second letter on Friday, April 2, 2021. (*Id.* ¶ 5.) In accordance with Rule 11, this motion will be filed no earlier than Monday, April 26, 2021 and only if Thrasio's complaint is not withdrawn in that period. (*Id.* ¶ 6.) As a result, the 21-day "safe harbor" requirement has been satisfied.

## IV.  CONCLUSION

For all the reasons stated above, Thrasio's complaint qualifies under Rule 11(b)(1) and (b)(3) for the imposition of sanctions pursuant to Rule 11(c). The Court should issue sanctions against Thrasio and its counsel and order them to pay Chanaratsopon's attorneys' fees and costs incurred in having to bring this motion-which Chanaratsopon attempted to avoid through multiple communications to no avail.

Date: October 6, 2021                **MICHELMAN & ROBINSON, LLP**

By:  */s/ Sanford L. Michelman*
Sanford L. Michelman
Timothy J. Gorry
Alexander R. Safyan
Camille R. Yona
Attorneys for Defendant
CHARLES CHANARATSOPON